**PANHANDLE EASTERN PIPE LINE COMPANY, Plaintiff,**

v.

**MICHIGAN CONSOLIDATED GAS COMPANY, Defendant.**

Civ. A. No. 7518.

United States District Court
E. D. Michigan, S. D.
May 15, 1959.

Carson C. Grunewald, Detroit, Mich., William E. Miller, George B. Mickum, III, Washington, D. C., Bodman, Longley, Bogle, Armstrong & Dahling, Detroit, Mich., Steptoe & Johnson, Washington, D. C., of counsel, for plaintiff.

A. D. Ruegsegger, Dyer, Meek, Ruegsegger & Bullard, Detroit, Mich., for defendant.

LEVIN, District Judge.

This action by Panhandle Eastern Pipe Line Company (hereinafter referred to as Panhandle) seeks to recover $601,354.-39 from Michigan Consolidated Gas Company (hereinafter referred to as Consolidated) an amount deducted by Consolidated from amounts due to Panhandle for deliveries of gas from July 23 through October 31, 1948, hereinafter referred to as the 101-day curtailment period. Consolidated contends that this sum was lawfully withheld as a setoff from payments made for gas delivered during that period, and that in addition to the setoff it is entitled by way of counterclaim to recover $548,067.[1]

Panhandle is a Delaware corporation owning and operating a natural gas pipeline system. In 1948 the main line of Panhandle consisted essentially of two pipe-line systems extending approximately 1,100 miles from the natural gas producing area in the Texas and Oklahoma Panhandles, and extending across the State of Kansas, Missouri, Illinois, Indiana and Ohio, and terminating in the State of Michigan. This main pipe line begins in southwestern Kansas at Panhandle's Liberal Compressor Station in the town of Liberal. Between Liberal and Detroit there are twelve compressor stations, as shown on the map accompanying this opinion. The basic func-

---

1. When this action was first instituted Consolidated asked for damages in excess of $1,000,000. Consolidated, after this issue was remanded to this Court by the Court of Appeals, filed an amended counterclaim requesting damages in the amount of $1,043,542 but thereafter, in a second amended counterclaim, reduced its claim to $548,067.

tion of a compressor station is to raise the suction pressure to a higher dis-charge pressure by which the gas is moved along to the next station.

Most of Panhandle's customers were served under so-called full requirement contracts wherein the customers were entitled to take all the gas they needed at any time without limitation. Some customers, including Consolidated, were served under maximum contract limitations wherein they were permitted to take all of their gas requirements up to the contract limitation. Panhandle also sold gas on an interruptible basis. Such sales are subject to curtailment when the gas is needed to meet present requirements of customers receiving gas on a firm basis.

It takes three days for gas to be pumped from Panhandle's station in Kansas to Detroit. Quantity changes in customers' demands occur due to day-to-day and seasonal variations in home and industrial requirements. Panhandle stationed a dispatcher at its Kansas City office to attempt to forecast the demands of customers and to change operating conditions to meet them. Customer demands, however, are not determinable with mathematical accuracy, and it was not possible for Panhandle to operate its pipe line with hundreds of delivery points precisely on a designed theoretical basis for an extended period.

On August 31, 1935 (prior to the enactment of the Natural Gas Act) Panhandle entered into a contract with Consolidated. This contract, as supplemented and amended, provided that Panhandle would sell and deliver to Consolidated, and that Consolidated would purchase "all of the natural gas requirements of Buyer [Consolidated] for distribution and sale to any and all of its present and future customers and for its own use" up to, but not in excess of 125,000,000 cubic feet per day (125,000 Mcf).[2]

With the enactment of the Natural Gas Act on June 21, 1938 (52 Stat. 821–833, Title 15 U.S.C.A. § 717–717w) Panhandle's service to Consolidated became subject to the jurisdiction of the Federal Power Commission. In 1946 the Commission authorized Panhandle to deliver 3,100,000 Mcf per month to Michigan Gas Storage Company, a Michigan corporation, not a party to this action, during the months of May, July, August and October, and 3,000,000 Mcf per month during June and September, or an average of 100,000 Mcf per day during this period. Prior to 1948 Consolidated did not take the maximum volume of gas permitted by its contract with Panhandle. In 1948 Consolidated undertook new interruptible sales and began taking deliveries to the full contract limit. The increased take of defendant and delay by Panhandle in completing a proposed construction program resulted in a shortage of gas in the area east of Panhandle's Edgerton Indiana Compressor Station, which is the most easterly compressor station before the gas enters Michigan. The Commission on March 23, 1948, instituted an investigation of this shortage. (Docket No. G–1023). Hearings were held and on July 17, 1948 the Commission issued opinion No. 166 and an accompanying order. In its opinion the Commission stated:

"* * * we are unwilling to make a finding with respect to the availability east of Edgerton station of specific volumes of gas. Rather we believe that Panhandle will exert every reasonable effort to deliver through that station the largest volume of gas possible; and we shall expect that, if necessary to do so, and to the extent required, Panhandle will make appropriate curtailment of interruptible deliveries pursuant to the provisions of effective tariffs and contracts."

The pertinent part of the order provides as follows:

"Upon consideration of the entire record herein, and in conformity with our Opinion No. 166 adopted this date, it is ordered that:

"(B) Until October 31, 1948, Panhandle Eastern Pipe Line Company

---

2. Gas is measured in terms of cubic feet or Mcf (1,000 cubic feet), related to a particular standard pressure and standard temperature.

shall make deliveries to Michigan Consolidated Gas Company at Detroit and to Michigan Gas Storage Company of such volumes of natural gas as may be available after making deliveries to all of its other customers east of its Edgerton Compressor Station (including deliveries provided for in Paragraph (A) hereof), pursuant to the provisions of the effective tariffs and contracts, as follows:

"Panhandle shall deliver to Michigan Consolidated 52% and to Michigan Gas Storage 48% of such available volumes of natural gas until such date as the total volumes delivered to both such companies from and after May 15, 1948, shall have reached a proportion of 55.6% to Michigan Consolidated and 44.4% to Michigan Gas Storage; and, from such date until October 31, 1948, such volumes of gas as may be available for delivery to these two companies shall be delivered by Panhandle on a daily basis in the proportion of 55.6% to Michigan Consolidated at Detroit and 44.4% to Michigan Gas Storage. Any variation in the daily delivery to either customer from the aforesaid percentages shall be adjusted within seven days."

Panhandle instituted this action in 1948, seeking damages against Consolidated in seven counts totaling approximately $2,000,000. Consolidated filed a counterclaim asking damages in excess of $1,000,000. The counterclaim was based on the contractual provision which provides that in the case of deficiencies in delivery, Panhandle is to "reimburse * * * Buyer [Consolidated] for any * * * loss * * * which it may sustain by reason of such failure, including the expense of putting into operation any gas manufacturing equipment, and/or obtaining manufactured gas or natural gas to remedy such deficiency." The counterclaim was dismissed by this court on a motion for summary judgment, on the ground that the court had no jurisdiction to consider the counterclaim as

it was a matter solely within the purview of the Federal Power Commission. This court also entered a judgment of no cause of action on Counts I, II, III, V, and VII but determined that Panhandle was entitled to recover $601,354.39 on Counts IV and VI, an amount which Consolidated had set off against the amounts due Panhandle for deliveries of gas to Consolidated during the curtailment period. Panhandle Eastern Pipe Line Company v. Michigan Consolidated Gas Company, D.C., 117 F.Supp. 551.

Both parties appealed from the judgment of the court and the Court of Appeals affirmed on Counts I, II, III, V and VII, but the judgment in favor of Panhandle on Counts IV and VI, and the order dismissing Consolidated's counterclaim, were reversed and the case remanded to this court. Panhandle Eastern Pipe Line Company v. Michigan Consolidated Gas Company, 6 Cir., 226 F.2d 60, certiorari denied 350 U.S. 987, 76 S. Ct. 473, 100 L.Ed. 853. At page 72 of 226 F.2d of its opinion the court states:

"As the District Court had jurisdiction of Consolidated's defense stated in Counts IV and VI, judgment as to these counts must be reversed. For the same reason judgment must be reversed as to the counterclaim. The case must be remanded for new trial on Counts IV and VI and the counterclaim, with direction to consider the actions and defenses pleaded and to consider the motions for discovery and make such order thereunder as is proper in accordance with Rule 34 of the Federal Rules of Civil Procedure, 28 U.S. C.A."

Since the remand I have held nine pretrial conferences. Extensive discovery proceedings were had under the supervision of the court. Approximately 22,000 book entries and documents were photographed. My experience in this trial again emphasized the merit of the pretrial practice. The pretrial conferences and discovery procedures employed made it possible to conclude within ten days a trial which, in the expressed view

of counsel for both parties, may well have taken many weeks if such expediting procedures were not invoked.

Prior to the hearing, in the company of counsel for both parties, I visited the Edgerton Compressor Station to examine the physical facilities of that station so as to have an understanding of how a compressor station operates.

In its opinion the Court of Appeals, 226 F.2d at page 71, states:

"The deficiencies in delivery are admitted and the asserted liability of Panhandle for reimbursement of expenses of manufacturer exists if the order of July 17, 1948, was violated by Panhandle."

In a supplemental opinion upon rehearing the court, 226 F.2d at page 73, comments as follows:

"Panhandle objects to the opinion because it states as to Counts IV and VI that the deficiencies sued for are 'admitted.' This statement is correct. Panhandle does not assert that it delivered up to the full capacity of Edgerton station as was ordered by the Commission July 17, 1948. Since the order was to deliver to the full capacity of the station and Panhandle's own records show that this was not done, the deficiencies are admitted."

Consolidated contends that in view of these statements a finding of admitted deficiencies is the "law of the case." I do not so construe the opinion of the Court of Appeals. In the original trial I did not consider the capacity of Edgerton Station because I then did not hear Consolidated on its defense to Counts IV and VI and the merits of its counterclaim. In view of the remand to hear this question it is clear that the Court of Appeals did not intend to determine this issue on the record before it. Indeed, the opinion of the Court of Appeals makes it clear that the asserted liability of Panhandle for reimbursement of expenses of manufacture exists only "if the order of July 17, 1948 was violated."

The issue to be determined is whether Panhandle delivered to Consolidated during the period July 23 to October 31, 1948 the volume of gas to which it was entitled by virtue of the Commission's opinion and order of July 17, 1948. If it did not, then Panhandle must respond in damages to Consolidated for any excess cost Consolidated had to expend in manufacturing the additional volume of gas it should have received if Panhandle had complied with the Commission's opinion and order.

Panhandle contends that it complied with the provisions of its contract, as modified by the Commission's order of July 17, 1948. Panhandle, to sustain its right of recovery of the amounts alleged owing by Consolidated, has the burden of proving that it delivered the quantity of gas required by the order of the Commission. Williston on Contracts, Vol. 3, Sec. 674, P. 1936; Jones on Evidence, Vol. 1, Sec. 206, P. 368; People v. Swineford, 77 Mich. 573, 43 N.W. 929.

Whether Panhandle complied with the Commission's order depends, except for the subsidiary questions raised, upon a determination of the capacity of Edgerton Compressor Station during the 101-day curtailment period. Essentially all of the discovery proceedings and the voluminous documents secured thereby were directed to garnering the basic information needed to conduct a capacity study of that station.

Three engineering studies of the capacity of the Edgerton Station for the curtailment period were introduced in evidence. Two of these studies were prepared in behalf of Panhandle and the other in behalf of Consolidated. One of the studies, prepared by a Panhandle staff engineer, concludes that the maximum sustained capacity of the Edgerton Station was 276,600 Mcf per day for the period July 23 through September 30, 1948, and 275,000 Mcf per day for the month of October, or an average of 276,109 Mcf per day for the curtailment period. The other Panhandle study

prepared by a member of a consulting engineering firm concludes that the sustained capacity of the station was 279,-600 Mcf per day for the period July 23 through September 30, 1948 and 279,200 Mcf per day for the month of October, or an average of 279,477 Mcf per day for the curtailment period. While both Panhandle studies were made independently, and differences in approach do exist, the variation in capacity in the two studies stems basically from the horsepower figure used by each of the experts.

In contrast to the conclusions reached by the Panhandle studies, the Consolidated study conducted by its expert, a member of a consulting engineering firm, concludes that the capacity for the station was 29,742,833 Mcf for the curtailment period, or an average of approximately 294,483 Mcf per day.

While both parties used the same basic formula, Panhandle's Flow Formula "A", in its capacity calculations, Consolidated and Panhandle are in disagreement as to the validity of the assumptions made by each of them as to four factors involved in the capacity study—the suction pressure at Freedom Terminal; the extent of pressure loss applicable to the movement of gas into and out of the compressor station from the point of recorded measurement to the theoretical point of measurement at the compressor cylinder; the factor, herein referred to as the composite or rolled-in factor, computed to adjust the theoretical computation of the flow formula to reflect actual conditions during the period under study; and the horsepower capacity of the engines at Edgerton Compressor Station.

I am not unmindful of Consolidated's contention that a study directed at determining the average capacity of the Edgerton Compressor Station (the method adopted by the Panhandle experts) is more theoretical than a capacity determination which is based upon a day by day evaluation of flow (the method adopted by Consolidated), and therefore is not as acceptable a measure in determining compliance with the Commission's order. After hearing the testi-mony, reading the record, and a study of the briefs I am convinced, however, that, at best, the determination of the capacity for any given period in the past cannot be anything but theoretical. The Panhandle Flow Formula "A", which was used by all the experts in all three studies, assumes a stable or uniform flow of gas. Yet a stable flow does not exist in practice. So, also, a constant discharge pressure of 700 pounds per square inch (P.S.I.) at Zionsville Compressor Station was used by all the experts whereas, in practice, no such constant pressure is maintained. Also, assumptions of necessity had to be made in the calculations of composite and rolled-in factors. In view of the many theoretical assumptions that had to be made in all of these studies, I do not see that any one method has any greater inherent validity than the other.

It is conceded that the suction pressure maintained at the Freedom Terminal affects the ultimate capacity determined. The higher the suction pressure maintained at Freedom, all other factors remaining the same, the lower the capacity at Edgerton and, conversely, the lower the suction pressure at Freedom, the greater the capacity at Edgerton. By the contract between Panhandle and Michigan Gas Storage, a contract approved by the Federal Power Commission, Panhandle was obligated to maintain a suction pressure of 275 P.S.I. at the Freedom Terminal. Whereas, the Panhandle studies utilized this contract pressure, Consolidated, in its study, although it was aware of this contract obligation, used a suction pressure of 210 P.S.I. The studies were an attempt to determine the capacity of Edgerton for a specific period in 1948 and, as such, should have reflected existing conditions and obligations. There is no justification for an assumption of a suction pressure at Freedom Terminal that constitutes a violation of Panhandle's contract obligation to Michigan Gas Storage.

Moreover, while the suction pressure at Freedom was recorded as low as 210 P.S.I., this pressure was never maintain-

ed for any one day and the actual average pressure maintained at Freedom for the curtailment period was 293 P.S.I. It was also admitted by Consolidated's expert that if it had used the actual pressure maintained at Zionsville, the study would have shown a lesser day by day capacity through Edgerton. There is no basis for an assumption that Panhandle was required to maintain the lowest recorded pressure at Freedom during the entire period of study. I find it was proper for Panhandle to utilize a suction pressure at Freedom of 275 P.S.I. in its studies.

There is loss of pressure when gas flows into and out of a compressor station from the point of actual pressure measurement to the theoretical point of measurement at the compressor cylinder. The extent of loss is dependent upon the length of pipe and any elbows in the piping between the actual measurement point and the theoretical place of measurement. The testimony reveals that it is customary in the industry to use a five-pound pressure loss to account for this loss. A Panhandle engineer, who conducted one of the Panhandle studies, testified that "in all the Federal Power Commission applications [and] exhibits that I have ever seen, they all use five pounds both in suction and discharge."

In its studies Panhandle used the customary five-pound pressure loss. In contrast, the Consolidated study made no allowance for pressure loss. The engineering expert for Consolidated testified that he did not make any allowance for pressure loss in his study inasmuch as his calculations showed that the pressure drop at Edgerton was less than one pound. This conclusion was not based on any study of actual conditions. He testified that he had not inspected or visited the Edgerton facilities and that he did not know the actual locations of the piping at the station. His conclusion was based on a study of a schematic diagram of the facilities, showing the piping from the point of actual measurement to the point of theoretical measurement as traveling in a straight line. However, this schematic drawing did not purport to be an engineering drawing to show the actual path and position of the station piping but was merely intended to show the relationship of the various facilities at the station. While the customary five-pound pressure drop used by Panhandle in its capacity study may be subject to correction by the calculation of the actual loss of pressure, in light of existing conditions, the determination made by Consolidated based on unsupported assumptions does not controvert the correctness of Panhandle's use of the five-pound figure.

Many factors, such as the flowing temperature of the gas transported, its specific gravity and supercompressibility, among others, affect the capacity of a pipe line and a compressor station. To give validity to any pipe-line capacity study, it is necessary to compute a factor to adjust the theoretical computation of the flow formula to reflect the actual conditions during the period under study, as shown by the pipe-line records. The Consolidated study computed a rolled-in factor to reflect this adjustment. This factor has a significant effect on the calculated capacity of a pipe-line and compressor station. The higher this factor, the lower the capacity, and the lower the factor, the higher the capacity. To provide for this adjustment the Panhandle engineer, in his study in behalf of Panhandle, computed a so-called composite factor based on selected days within the curtailment period. This composite factor he determined to be 1.180 for the Edgerton to Detroit section of the pipe line and 1.195 for the Zionsville to Edgerton section.

In contrast, Consolidated calculated a rolled-in factor of 1.166 for the Edgerton to Detroit section and a rolled-in factor of 1.172 for the Zionsville to Edgerton section. These factors were obtained by a study of records for the month of February, 1948, with a purported correction to reflect conditions existing during the period under study. However, for all sections of the pipe line west of Montezuma, the Consolidated study did not depart from the curtailment period in

determining a rolled-in factor. It is significant that the work records of the Consolidated expert reveal that he first derived a rolled-in factor for the Zionsville to Edgerton and Edgerton to Detroit sections of the pipe line by a study of selected days within the curtailment period, and derived a factor of 1.181 for the Edgerton to Detroit section and 1.206 for the Zionsville to Edgerton section. He then calculated a rolled-in factor for the same sections, based on an average of all days during the curtailment period, and determined the factor for the Edgerton to Detroit section to be 1.189 and 1.208 for the Zionsville to Edgerton section. The factors derived with reference to selected days, and the average of all days within the curtailment period which the Consolidated expert computed and rejected, closely approximated or were higher than the composite factors computed by the Panhandle engineer. The factors that were actually used by Consolidated were lower than those he calculated from the period under study and resulted in the obtaining of a higher capacity. No satisfactory explanation has been offered for the rejection of the factors so computed. The purpose of the rolled-in factor is to reflect actual conditions during the period under study. The use of a foreign period as a point of departure, where temperatures, flowing conditions, character of the gas and gas deliveries are concededly different to determine a factor to reflect conditions within the study period, is not consistent with this purpose.

Though the expert of Consolidated admittedly did attempt to adjust for these differences to reflect conditions existing during the period under study, the circular approach adopted by Consolidated to determine this adjustment increased the possibility of error. In fact, at least two errors are apparent. In adjusting for the difference in temperature between February and the 101-day period, he made his adjustment from a February temperature of 49° to the higher summer temperature of 69°, whereas the Panhandle records showed an average tempera-

ture of 40° in February. He also made a supercompressibility adjustment. In a high pressure gas transmission system gas does not respond to ideal gas law. The supercompressibility factor attempts to adjust for this deviation. The higher the temperature, the smaller the supercompressibility factor, and the lower the supercompressibility factor, the lower the capacity. The supercompressibility factor he used for this adjustment was 2.5 per cent per hundred pound increase in pressure. The deviation factor used by Consolidated was not taken from any Panhandle record. It was not shown to have any relation to Panhandle gas. Nor was any attempt made to adjust this factor for the higher temperature during the 101-day period.

No valid reason is apparent for this circular approach adopted by Consolidated in calculating its rolled-in factors. I find that the composite factors derived by Panhandle more accurately summarize the adjustment required to reflect actual conditions existing during the curtailment period.

During the curtailment period the Edgerton Compressor Station housed seven compressor engines consisting of two Clark BA–8 vertical engines rated at 1600 horsepower each, and five Cooper-Bessemer Type 24 horizontal engines rated at 1300 horsepower each, for a total of 9700 installed horsepower for the seven engines. The calculations made by the Panhandle engineer in his study in determining the capacity of Edgerton Compressor Station is based on the assumption that the installed horsepower available at Edgerton was 9700. In the other study Panhandle's expert did not use the manufacturer's charts, but used a horsepower formula which was in use by Panhandle in 1948 and which he had used in 1948 in connection with consulting work that he did for Panhandle and others. This formula rated the engines at approximately 6 to 8 per cent over the horsepower rating appearing on the manufacturer's charts, a percentage which the expert considered to be the maximum overload to which the engines could be

safely subjected on a sustained basis for the curtailment period. The expert who prepared the capacity study for Consolidated used a horsepower formula that he developed specifically for this study.

At one of the pretrial hearings, held to determine the scope and latitude of discovery necessary to enable Consolidated to secure sufficient information to prepare its capacity study, the Consolidated expert stated that he would employ a specially constructed formula to determine the horsepower rating of the Edgerton engines only in the event that he was unable to obtain the manufacturer's horsepower curves. At the trial he testified that although the manufacturer's charts were available to him, he did not use them for he did not have "enough information to understand them," and that he "didn't understand the formulas, nor how to use them."

There are two errors in the horsepower formula developed by the Consolidated expert. Among the factors entering into the derivation of the horsepower per million formula is the supercompressibility factor and the so-called "N" factor. He used a supercompressibility factor between 2.25 and 2.50 per cent for each 100 pounds of increase in pressure. The factor was obtained from the Natural Gasoline Supplymen's Association Engineering Data Book. In developing the factor he used certain basic data which was not to be used if the nitrogen content of the gas was more than 5 per cent. The use of a lower supercompressibility factor would have resulted in a lower capacity figure for Edgerton. He did, however, use this data although the nitrogen content of the gas in the Hugoton and Texas Panhandle Fields, from which the Panhandle pipe-line supply was drawn, was respectively 16.3 per cent and 11.3 per cent. He obtained his "N" factor from the same data book from which he obtained his supercompressibility factor. He derived his "N" factor from a chart which stated that this factor was the approximate "N" value of hydrocarbon gases. Whereas, by his own admission,

Panhandle gas was not a hydrocarbon gas.

In its brief, Consolidated concludes that the horsepower available at Edgerton must be stated as 9700, the horsepower derived from the manufacturer's charts, times 126.95, or 12,314 horsepower, and that "any analysis determining the capacity of Edgerton Station based upon a limitation of 9700 horsepower is completely unrealistic." Thus the question presented is whether there is any basis for Consolidated's claim that the capacity of Edgerton must be ascertained by adjusting the manufacturer's horsepower rating for the engines at Edgerton by approximately 27 per cent.

On this question the testimony of the representatives of the companies that furnished the compressor engines to Panhandle, based upon studies of the use of their respective engines during the curtailment period, is significant. On August 20, 1948 the Vice-President of Engineering of Clark Bros. Co., Inc. checked the operation of the two Clark engines. In his report to Panhandle he stated "that the engines were being operated continuously at overloads varying from approximately 12 per cent to 21.8 per cent" and concluded that: "As compressor manufacturers, we cannot recommend operating our engines continuously at these overloads, as we feel that a major breakdown is liable to result."

On the same date a consulting engineer for the Cooper-Bessemer Corporation studied the operation of Panhandle's Cooper-Bessemer engines and concluded that "the units are grossly overloaded at the present operating pressures." This conclusion was based upon the observation that: "An average of the maximum overload during the time mentioned above [July 1 to August 19, 1948] is 22.98% while the average minimum overload is 19.8%." Panhandle was obligated to "exert every reasonable effort to deliver through that station the largest volume of gas possible." In view of this expert testimony of the Cooper-Bessemer and Clark Bros. personnel, I con-

clude that a reasonable effort did not obligate Panhandle to operate its engines in excess of 6 to 8 per cent above that of the manufacturer's rated capacity of such engines in determining the capacity of its Edgerton station.

I conclude that the capacity of Edgerton Compressor Station for the period July 23 through October 31, 1948 was not in excess of an average of 279,477 Mcf per day, or approximately 28,227,200 Mcf for the entire period.

Additional support for this conclusion is also found in sources other than the capacity studies. During the hearings, which culminated in the issuance of opinion 166 and the accompanying order of July 17, 1948, Panhandle contended that the maximum capacity of its Edgerton Station was between 265,000 and 270,000 Mcf per day. While the Commission thought that a substantially larger volume of gas could be delivered through Edgerton, it did state as follows: "Nevertheless we shall use this figure [270,000 Mcf] for our present purpose; and there would thus appear to be an excess of firm demands upon the Panhandle system east of its Edgerton Station above the capacity of that part of its system amounting to approximately 30,000 Mcf per day." The demands on Panhandle's system east of Edgerton at the time of the hearing, which led to the issuance of the order now in controversy, were 290,000 Mcf per day. The Commission shifted 10,000 Mcf per day from a delivery point west of Edgerton (Muncie) to the Maumee delivery point east of Edgerton. This shift accounts for the assumption by the Commission of 30,000 Mcf per day as the approximate deficit in terms of the demands east of Edgerton. It would seem, therefore, that while the Commission thought that the capacity of Edgerton was more than 270,000 Mcf per day it did not believe that it was as great as the 294,483 Mcf per day capacity now contended for by Consolidated.

An additional observation may be made in this connection. The Commission instituted an action (Civil Action No. 956) in the United States District Court for the Southern District of Illinois against Illinois Power Company, an interruptible customer of Panhandle, to compel compliance with an order curtailing its take of gas. Although Consolidated was not a party to this action, and the proceedings therein are in no wise controlling here, it is significant that an engineer employed by the Commission testified at a hearing held on October 12, 1948 that "280,000,000 cubic feet per day [280,000 Mcf] was the largest volume that could be handled by the Edgerton Compressor Station on the Panhandle Eastern on a sustained basis." This conclusion was based upon an analysis of operating data obtained from Panhandle. There is a marked correlation between the conclusion of the Commission's expert and the conclusion by Panhandle's consulting engineer that the capacity at Edgerton was an average of 279,477 Mcf per day.

Based upon a projection of the average capacity over the curtailment period, Consolidated was entitled to 52 per cent of 20,794,030 Mcf (the 28,227,200 Mcf capacity of the curtailment period less deliveries of 7,433,170 Mcf to Panhandle's customers east of Edgerton other than Consolidated and Michigan Gas Storage), or 10,812,896 Mcf. While the projected theoretical capacity of Edgerton for the curtailment period is in excess of the actual sales east of Edgerton of 28,114,758 Mcf for that period, Consolidated during this period actually received 11,479,462 Mcf or 666,566 Mcf more than its allocable share of the computed capacity of Edgerton. Panhandle, therefore, has complied with the Commission's order unless the arguments advanced by Consolidated, which I shall now discuss, compels a different result.

■ Consolidated contends that the Commission's order of July 17, 1948 required that Panhandle curtail deliveries to its interruptible customers east of Edgerton. During the curtailment period Panhandle delivered 52,981 Mcf of gas to two interruptible customers east of Edgerton, Michigan Seamless Tube Company and Albion Malleable Iron Com-

pany. Consolidated, therefore, concludes that regardless of the capacity of Edgerton Station there is an admitted deficiency in deliveries to it of 27,550 Mcf (52 per cent of 52,981 Mcf) for which Panhandle must answer in damages. This contention is without merit. The Commission's order states that deliveries were to be made to Consolidated and Michigan Gas Storage "after making deliveries to all of its other customers east of its Edgerton Compressor Station." Since Michigan Seamless Tube Company and Albion Malleable Iron Company were customers east of Edgerton, the clear language of the Commission's order did not require curtailment of these deliveries. That this is the unequivocal meaning of the order is also evident from the opinion of the Court of Appeals. At page 71 of 226 F.2d the court states:

> "We construe the order as granting to Consolidated and Michigan Gas Storage priorities over interruptible customers *west of Edgerton* in the volume of gas to be delivered by Panhandle at Edgerton up to the capacity of that station." (Emphasis added.)

It is also contended by Consolidated that at the time it issued its order, the Commission was not aware that Panhandle was making deliveries to interruptible customers east of Edgerton. I find no support for this conclusion. Exhibits before the Commission showed specifically what Panhandle's interruptible deliveries had been prior to the hearing, what they were at the time of the hearing, and what they were estimated to be through October 1948. Moreover, if a factual basis for this contention did exist, while it would have been proper for Consolidated to seek reformation of the order for that reason this argument cannot now be urged here.

Panhandle, by the terms of the Commission's order, was obligated to "make appropriate curtailment of interruptible deliveries" west of Edgerton to the extent required. During the curtailment period Panhandle delivered 7,000 Mcf of gas per day to interruptible customers west of Edgerton. The evidence establishes that if these deliveries had been curtailed, an additional 800 Mcf of gas per day, or 80,800 Mcf for the entire period, could have been put through Edgerton and made available for delivery to Consolidated and Michigan Gas Storage. Consolidated, therefore, contends that there is an admitted deficiency of 42,016 Mcf of gas (52 per cent of 80,800 Mcf) during the curtailment period for which Panhandle must answer in damages.

The Panhandle capacity studies were based on the assumption that Zionsville was operating at its maximum discharge pressure of 700 P.S.I. during the entire period, thus assuming a maximum flow through Zionsville. This assumption of a maximum flow through Zionsville in effect curtailed interruptible deliveries west of Zionsville. The Panhandle studies also treated all interruptibles between Zionsville and Edgerton as curtailed. Thus the studies gave effect to the Commission's order that Panhandle give priority to Consolidated over interruptible customers west of Edgerton.

The argument of Consolidated that if Panhandle had maintained a suction pressure no higher than 275 P.S.I. at Freedom, Panhandle could have increased its Edgerton capacity by approximately 35,350 Mcf for the 101-day period and, therefore, there is an admitted deficiency to Consolidated of 18,382 Mcf (52 per cent of 35,350 Mcf) is untenable in the light of the proofs which show that Panhandle did, in fact, use a suction pressure of 275 P.S.I. in its capacity studies.

Based upon my determination of the capacity of Edgerton Station, Consolidated received 666,566 Mcf in excess of its allocable share under the Commission's order. Consolidated contends that it should have received an additional 87,948 Mcf during the curtailment period, regardless of the capacity of Edgerton, by reason of Panhandle's decision not to curtail interruptible deliveries both east and west of Edgerton and Panhandle's maintenance of an average suction pressure at Freedom Compressor Station in

excess of 275 P.S.I. Even if it be assumed that this contention is tenable, this additional volume would merely have reduced the excess volume of gas that Consolidated did receive to 578,618 Mcf.

And now a word about deliveries made by Panhandle from its Howell Field located in Michigan. During the curtailment period Panhandle also produced gas in its Howell Field and delivered 735,632 Mcf of this gas to Consumers Power Company at its Howell-Salem delivery point. Consolidated contends that this gas derived from the Howell Field is includible in the volume of gas that should have been made available to it and Michigan Gas Storage, and that it was therefore entitled to an additional 382,529 Mcf (52 per cent of 735,632 Mcf). This contention is based, in part, on the theory that deliveries to Consumers Power were in reality deliveries to Michigan Gas Storage and, in part, on the theory that the Commission's order required the inclusion of the Howell volume in the Edgerton capacity.

Neither of these theories is valid. Michigan Gas Storage was organized as a separate company on June 4, 1946. The deliveries of Howell gas were made to Consumers Power pursuant to contracts entered into on August 12, 1947 and June 30, 1948 between Panhandle and Consumers Power. The deliveries were made to Consumers Power and were billed to and paid for by Consumers Power. Nowhere in the record does it appear that the deliveries to Consumers Power were fictional and made to Consumers Power in behalf of Michigan Gas Storage.

The Commission was aware of the deliveries by Panhandle from its Howell Field to Consumers Power and recognized that these deliveries would continue. Its opinion makes it clear that it intended only to allocate the main line interstate stream of gas transmitted through Panhandle's Edgerton Station and not the intrastate delivery of Howell gas to Consumers Power.

The addition of the Howell Field deliveries to the volume of gas available to Consolidated and Michigan Gas Storage from the Edgerton Station is also precluded by the explicit terms of the order which provides that Panhandle "shall make deliveries to Michigan Consolidated Gas Company at Detroit and to Michigan Gas Storage Company of such volumes of natural gas as may be available after making deliveries to all of its other customers east of its Edgerton Compressor Station * * *." Consumers Power was a customer east of Edgerton and deliveries to it were, by the very terms of the order, not volumes of gas available for delivery to Consolidated and Michigan Gas Storage.

It is the opinion of the court that Panhandle complied with the July 17, 1948 order of the Commission. Therefore, the plaintiff shall have judgment for $601,-354.39 and the defendant shall take nothing on its counterclaim.